Carolyn Cottingham ("Carolyn"[1]) appeals from the February 28, 2002, summary judgment of the trial court in favor of The Citizens Bank ("the Bank") and Wayne Gentry.
On January 30, 2001, Carolyn sued the Bank and Gentry in the Circuit Court of Lawrence County, alleging that the defendants, fraudulently and in bad faith, had foreclosed on a mortgage given by her and her husband to the Bank, had defamed her character, had harassed her, and had damaged her expectation of good credit. On March 8, 2001, the Bank and Gentry filed a motion to dismiss, which was denied on May 24, 2001. The Bank and Gentry filed a joint motion for a summary judgment on December 21, 2001. On January 10, 2002, Carolyn filed a "Statement in Opposition" to the motion for a summary judgment and attached evidentiary support, including the affidavit of her ex-husband, Donnie Cottingham ("Donnie"). That same day, the Bank and Gentry filed a "Narrative Summary of Undisputed Facts" with the trial court. On January 28, 2002, they filed a supplement to their motion for a summary judgment.
On February 4, 2002, the Bank and Gentry filed a brief in support of the motion for a summary judgment and also a supplemental exhibit to their brief in support of their motion for a summary judgment. On February 13, 2002, the Bank and Gentry filed an objection and a motion to strike Carolyn's statement in opposition and also to strike Donnie's affidavit. Without ruling on the objection and the motion to strike, the trial court granted the Bank and Gentry's motion for a summary judgment on February 28, 2002. The trial court's order states, in pertinent part:
 "On February 13, 2002, the Court met with the attorneys for the parties with regard to the pending motion for summary judgment. The Court finds that there are no disputed issues of material facts and that the defendants are entitled to a judgment as a matter of law. Accordingly, judgment is hereby entered *Page 416 
on behalf of The Citizens Bank and Wayne Gentry."
On March 26, 2002, Carolyn filed a notice of appeal.
On appeal, Carolyn argues that the Bank and Gentry's motion for a summary judgment should have been denied because, she says, she presented substantial evidence indicating: 1) that the debt, represented by two 1988 notes to the Bank, was extinguished either in 1992 or some time subsequent; and 2) that "the foreclosure was fraudulent because her mortgage was fraudulently and wrongfully used to secure future advancements of indebtedness leading to the foreclosure of her interest in her home." Because of our disposition of Carolyn's first argument, we need not address her second argument.
Our review of a summary judgment is de novo.
 "In reviewing the disposition of a motion for summary judgment, `we utilize the same standard as the trial court in determining whether the evidence before [it] made out a genuine issue of material fact,' Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala. 1988), and whether the movant was `entitled to a judgment as a matter of law.' Wright v. Wright, 654 So.2d 542 (Ala. 1995); Rule 56(c), Ala.R.Civ.P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989). Evidence is `substantial' if it is of `such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' Wright, 654 So.2d at 543 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989)). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Wilma Corp. v. Fleming Foods of Alabama, Inc., 613 So.2d 359 (Ala. 1993); Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala. 1990)."
Hobson v. American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala. 1997).
The record reveals the following facts. On March 15, 1988, Carolyn; her then husband, Donnie; Donnie's brother, Jimmy Cottingham ("Jimmy"); and Jimmy's wife, Joyce Cottingham ("Joyce"), signed two promissory notes with the Bank. The first note, numbered 3037876, evidenced a debt of $129,000, and the second note, numbered 3037843, evidenced a line of credit for $100,172. Both notes evidenced an annual interest charge of 11% and listed the borrower as "D and J Mechanical," the business owned and operated by Donnie and Jimmy.
Also, on March 15, 1988, two mortgages were executed as security for the notes. One was executed by Jimmy and Joyce, and the other by Donnie and Carolyn. The mortgage executed by Donnie and Carolyn (hereinafter referred to as "the mortgage") was to secure the amount of $60,000, and it did not contain a future-advance clause.[2] The mortgage was handled by Wayne Gentry, a representative of the Bank. Additional security was provided *Page 417 
by two financing statements, each listing inventory, equipment, and accounts receivable, that we infer from the record were owned by "D and J Mechanical."
On March 29, 1989, Donnie, Joyce, and Carolyn signed a note for $100,000,[3] listing as security the 1988 mortgages and the "inventory and equip[ment] and accounts rec[eivable] as listed on" the Uniform Commercial Code statement sheet. The note lists the borrower as, "D J Mechanical" and then "Donnie and Jimmy Cottingham." The note indicates that it is a renewal[4] of the 1988 note for the line of credit, but charges an annual interest rate of 14%. The "Schedule of Notes Secured by Mortgage Dated March 15, 1988," prepared by counsel for the Bank and Gentry and provided by them to the trial court, purports to show that a note executed in 1990, numbered 3047099, was a renewal of 3037843, the 1988 note for the line of credit. However, the copy contained in the record of note 3047099 is largely unreadable and reveals nothing of significance. On December 21, 1992, Alafabco, Inc.;[5]
Donnie, acting as president of Alafabco, Inc.; and Jimmy, acting as vice president of Alafabco, Inc., executed a note for $157,614.08 to the Bank. The note indicates that it is a renewal of 3037876 and 3047099, along with other notes. The note charges an annual interest rate of 8%, and lists as security the 1988 mortgages and the "inventory, equipment, accounts receivable filed on" the Uniform Commercial Code statement sheet. The "borrower's name and address" section of this note bears only the entry, "Alafabco, Inc.," and an address. None of the notes contained in the record and asserted by the Bank to be renewals of the 1988 notes bear Carolyn's signature.
The affidavit of Doug Alexander, a vice president of the Bank, states, in relevant part:
 "My name is Doug Alexander. I am over the age of 19 years and have personal knowledge of the matters and things set forth herein. I am the Vice-President of The Citizens Bank, Defendant in the above-referenced action. I have reviewed the complaint in the above-styled cause and am familiar with the allegations made by the plaintiff therein. I have also reviewed the records of The Citizens Bank pertaining to transactions between the Plaintiff and the Bank. I am the custodian of the records attached hereto as Exhibits B through O, and these are true and correct copies of the original documents. The documents contained in Exhibits B through O are business records of the bank, kept in the usual and ordinary course of business, and it is the practice of the bank to keep such business records. I am familiar with the method used by the bank for making records of the kind exhibited, and the records contained in Exhibits B through O were made in the regular course of business either at the time of the event recorded or within a reasonable time thereafter. The `Schedule of Notes Secured by Mortgage Dated March 15, 1988,' attached hereto as Exhibit A, has been prepared by counsel for The Citizens Bank for ease in following the history of the original note between The Citizens *Page 418 
Bank and the Plaintiff, and is a true and accurate compilation.
 "The records attached hereto relate to transactions between the Plaintiff and The Citizens Bank. These records clearly demonstrate that sometime on or about March 15, 1988, Donnie Cottingham and Carolyn Cottingham executed a mortgage to secure a note from The Citizens Bank. On or about December 21, 1992, the remaining balance on the note secured by the Cottingham's mortgage was renewed into a new note. From December 21, 1992 to December 10, 1999, the funds borrowed under the original note were renewed numerous times. On May 1, 1998, Carolyn Cottingham executed a guaranty on a loan which was secured by the mortgage entered into on March 19, 1988.
 "Upon non-payment of the note dated May 1, 1998, a default occurred. Upon default, [the Bank] instituted foreclosure proceedings on the residence of Donnie and Carolyn Cottingham. The foreclosure notices were duly published and the foreclosure sale was held on February 1, 2001. At the foreclosure sale, the Bank was the purchaser of the property. On February 5, 2001, counsel for the Bank forwarded to Carolyn Cottingham statutory notice, pursuant to Alabama Code Section 6-5-215, that the Bank had purchased the property and that if she did not vacate the premises within ten days, she forfeited her statutory right of redemption.
 "At no time from origination of the first note for which the March 15, 1988 mortgage secured was the indebtedness ever paid in full or satisfied."
In 1999, Carolyn and Donnie were divorced. The divorce judgment provided that the residence would be jointly owned by them and that Carolyn would be able to reside at the residence until she remarried.
Although the record is unclear as to the exact date, at some point in late 2000, or early 2001, and before the foreclosure sale, Doug Alexander visited Carolyn at her residence and inquired as to whether she had received a certain piece of "paper,"[6] and whether she planned to vacate the house. In her deposition, Carolyn states that she told Alexander, "[N]o, sir. I have no place to go. This is my home, you know." Afterwards, Alexander gave Carolyn his card and he left the premises. Carolyn testified that since executing the notes secured by the mortgage in 1988, and before the occasion when Alexander visited her, she had had no conversations or communications with any representative of the Bank.
Carolyn asserts that at some point in the 1990's, the mortgage was satisfied. However, in their brief to this Court, the Bank and Gentry argue that "[f]rom December, 1992 through December, 1999, the initial loan from [the Bank] which was secured by the mortgage on Donald and Carolyn Cottingham's residence was renewed numerous times," and later was in default for nonpayment.
The mortgage states, in pertinent part:
 "Borrower [Donald W. Cottingham and Carolyn J. Cottingham] owes Lender [the Bank] the principal sum of sixty thousand and no/100 dollars. . . . This debt is evidenced by Borrower's note dated the same date as this Security *Page 419 
Instrument (`Note'), which provides for monthly payments, with the full debt, if not paid earlier, due and payable on March 15, 1989. This Security Instrument secures to lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extensions and modifications. . . .
". . . .
 "21. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument without charge to Borrower. Borrower shall pay any recordation costs."
Thus, on its face, the mortgage contemplates that it will secure renewals of the original debt as evidenced by the note[7] signed on March 15, 1988. However, as mentioned earlier, the mortgage does not contain a future-advance clause, and, as the Bank and Gentry admit in their brief, neither does the "original promissory note executed by the plaintiff." Nevertheless, in their "Narrative Summary of Undisputed Facts," the Bank and Gentry asserted to the trial court that, "[o]n December 21, 1992, the loan secured by the mortgage on Donald and Carolyn Cottingham's residence was renewed along with another loan into a new loan for a total amount of $300,000.00." (Emphasis added.)
"The law in Alabama is clear that a mortgage for a specific debt cannot be used to secure any subsequent advances in the absence of an express provision securing future indebtedness." Johnson v. Shirley, 539 So.2d 165,168 (Ala. 1988). See also First State Bank of Franklin County v. Ford,484 So.2d 407, 408 (Ala. 1986); Cooper v. Elba Exchange Bank, 496 So.2d 41,43 (Ala. 1986). "Alabama case law holds that future advance clauses are valid to extend `the security to other existing indebtedness or to future indebtedness between the same parties.'" Ex parte Chandler, 477 So.2d 360,362 (Ala. 1985) (quoting Underwood v. Jarvis, 358 So.2d 731, 733 (Ala. 1978); First Nat'l Bank of Guntersville v. Bain, 237 Ala. 580, 582,188 So. 64, 66 (1939)). Because of the "absence of an express provision securing future indebtedness," i.e., a future-advance clause, within the mortgage, even if the 1988 notes were renewed, an issue we need not address, no new indebtedness could be added to the debt specifically secured by the mortgage, here, $60,000 of the 1988 notes.
The Bank and Gentry reference a clause contained in the notes executed by Carolyn on March 15, 1988, that states, "[t]his security agreement remains in effect, even if the note is paid and I owe no debt to you until discharged in writing." The Bank and Gentry ask this Court to hold that even if the debt secured by the mortgage was paid in full, because no writing discharged the mortgage, it remained in effect under the security agreement contained in the 1988 notes. However, under Alabama law, "[p]ayment of the mortgage debt before foreclosure divests the title of the mortgagee." Crabtree v. Price, 212 Ala. 387, 388, 102 So. 605, 606
(1924). As this Court stated in Barrentine v. Parker, 236 Ala. 188, 190,181 So. 263, 265 (1938):
 "The main right of a mortgagee is to collect his debt, and if necessary to subject the land to sale for that purpose. All other rights are subsidiary to that main one; so that when the debt is paid, the mortgagee has no further rights *Page 420 
under the mortgage, and his title acquired by it becomes, ipso facto, divested out of him, section 9026 Code, likewise, all subsidiary rights."
Furthermore, "[i]n the absence of any statute on the subject, the rule, well-nigh universal, is that, when a debt secured by a mortgage has been paid, the mortgage becomes functus officio, and it cannot be made to stand as security for a new or different debt between the parties, or reissued to a different creditor." Hammock v. Oakley, 228 Ala. 588, 589,154 So. 906, 908 (1934).
Section 35-10-26, Ala. Code 1975, states, in relevant part:
 "The payment or satisfaction of the real property mortgage debt divests the title passing by the mortgage. `Payment or satisfaction of the real property mortgage debt' shall not occur until there is no outstanding indebtedness or other obligation secured by the mortgage, and no commitment or agreement by the mortgagee to make advances, incur obligations or otherwise give value (collectively referred to as `extend value'), under any agreement, including, without limitation, agreements providing for future advances, open end, revolving or other lines of credit, or letters of credit."
In short, as this Court stated in Jarrett v. Hagedorn, 237 Ala. 66, 68,185 So. 401, 402 (1938), "[i]f there is no debt there is no mortgage." Moreover, section 21 of the mortgage states, in relevant part, "[u]pon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument without charge to Borrower." Accordingly, if the debt secured by the mortgage had been paid in full, the defendants would have been divested of their legal rights in the property, whether or not the security agreements referenced in the notes remained in effect.
As Carolyn points out, the record before us contains copies of the Bank's loan history records relating to the 1988 notes. The "loan history record" for note 3037876 shows that on December 22, 1992, two credits were posted against the balance owing on the note, each of which exceeded $25,000, and which served to reduce the "current balance" to ".00." That is the last entry on that record. Likewise the Bank's "loan history record" for note 3037843 shows that on July 24, 1990, a credit was posted in the amount of $85,001, again resulting in a "current balance" concluding entry of ".00." Thus, the evidence before us supports an inference that the debt secured by the mortgage, as evidenced by the 1988 notes, was paid in full. Therefore, an issue of material fact exists as to whether the mortgage was satisfied.
Although our holding renders a full analysis of the Bank and Gentry's next argument unnecessary for our disposition of this appeal, we note that the Bank and Gentry also argue that Carolyn "executed a guaranty on May 1, 1998, which was secured by the 1988 mortgage she had executed." A copy of such a guaranty is found in the record, bearing what purports to be Carolyn's signature. However, Carolyn states in her affidavit, "[I]n 1998, my relationship with Donnie Cottingham was bad and I was not speaking to him. I did not sign any guaranty and I would not have signed anything that would have been in his interest at the time." Moreover, Carolyn testified in her deposition, cited to by the Bank and Gentry in their brief, that she had had no contact with the Bank or Gentry, other than an initial meeting with Gentry and, years later, the meeting with Alexander. Thus, the authenticity of the signature contained on the guaranty is an issue of material fact, and a summary judgment based upon Cottingham's purported guaranty would be inappropriate on *Page 421 
the record presently before this Court. Hobson, supra. Accordingly, the judgment of the trial court is reversed, and the cause is remanded to the trial court for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
MOORE, C.J., and SEE, BROWN, and STUART, JJ., concur.
[1] Because three other persons referred to in this opinion share the surname "Cottingham," we are referring to all four by their first names.
[2] "A contractual term in a security agreement covering additional loaned amounts on present collateral or collateral to be acquired in the future, regardless of whether the secured party is obliged to make the advances; esp., a provision in an open-end mortgage or deed of trust allowing the borrower to borrow additional sums in the future, secured under the same instrument and by the same security." Black's LawDictionary 685 (7th ed. 1999).
[3] The copy of the note contained in the record is illegible with regard to a final signature, purportedly that of Jimmy.
[4] "[R]enewal note. A note that continues an obligation that was due under a prior note." Black's Law Dictionary 1086 (7th ed. 1999).
[5] We infer from the record that this is a business managed, at least in part, by Jimmy and Donnie.
[6] Although the Bank and Gentry assert in their brief that the "paper" was the February 5, 2001, statutory notice and cite to Carolyn's testimony in support of that assertion, her cited testimony states, "I didn't know who he was because I'd never seen him. And he got this piece of paper, and he said, did you get one of these? And I said, yes, sir."
[7] Although the mortgage, on its face, secures only a single note dated March 15, 1988, the parties do not argue which of the 1988 notes is secured by the mortgage, and indeed Carolyn takes the position that "the evidence provided by [her] establishes that the 1988 notes secured by the 1988 Mortgage of Donnie and Carolyn Cottingham were extinguished . . . ."